DA 23-0380

FILED

04/28/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0380

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 92

STATE OF MONTANA,

        Plaintiff and Appellee,

    v.

SERENITY ALANA MANN,

        Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis And Clark, Cause No. DDC 2021-552
Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Nicholas T. Hine, Hine Law PLLC, Brooklyn, New York

        For Appellee:

        Austin Knudsen, Montana Attorney General, Selene Koepke, Assistant
Attorney General, Helena, Montana

        Kevin Downs, Lewis and Clark County Attorney, Mary Barry, Deputy
County Attorney, Helena, Montana

                Submitted on Briefs:  April 1, 2026

                      Decided:  April 28, 2026

Filed:

                        _____
                                 Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1    Serenity Alana Mann appeals a conviction for Strangulation of a Partner or Family Member, a felony. Following a jury trial, the First Judicial District Court for Lewis and Clark County sentenced Mann to five years in Montana State Prison, all suspended. We affirm.

¶2    We restate the issue on appeal as follows:

*Whether the District Court abused its discretion by permitting other acts testimony.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    Mann and S.R. began dating in 2008. Over the course of the relationship, Mann was physically abusive towards S.R., allegedly engaging in emotional abuse and coercive, forcible, and nonconsensual sexual activities. On November 16, 2021, an altercation ensued between the pair over S.R.'s Facebook conversation with another man. Mann took S.R.'s phone away from her. S.R. regained the phone and attempted to leave the room. Mann followed S.R. into the hallway and knocked her down to the floor. Mann then put S.R. into a "choker hold."

¶4    Weighing over 300 pounds, Mann is larger and stronger than S.R. It is unclear whether Mann placed a knee or entire body weight on S.R.'s back. S.R. described all this weight on top of her back as "painful" and she "wanted to die because of [sic] the pain wouldn't stop." Eventually, Mann ceased choking S.R., and though S.R. did not lose consciousness through this incident but felt "lightheaded."

¶5 S.R. did not report this assault to law enforcement. That evening, S.R. called her sister, M.R., who didn't answer. The next day, M.R. returned S.R.'s call. M.R. could tell S.R. had been crying, and S.R. was speaking in a whisper. Concerned about her sister, M.R. picked up S.R. from home and brought S.R. to work with her. S.R. told her sister Mann had taken her phone because she was talking to another person. Mann had deleted S.R.'s Facebook and blocked people. When S.R. attempted to get the phone back, Mann grabbed her and put her in a chokehold. S.R. told M.R. she and Mann had stumbled while Mann had S.R. in the chokehold, and Mann had pushed S.R.'s back, causing her pain.

¶6 On November 18, 2021, Lewis and Clark County Sheriff's Detective Jess Metcalf contacted S.R. and arranged to meet with her. Unsure of whether S.R. would report any abuse, Detective Metcalf met S.R. and M.R. in an Albertson's parking lot. During the meeting, S.R. was cooperative, giving Detective Metcalf "a flood of information." S.R. and M.R. met Detective Metcalf again at the Lewis and Clark County Sheriff's Office to give formal statements. The Detective described S.R.'s behavior during this interview as "scared, tearful, frightened, concerned, [and] apprehensive."

¶7 After these two interviews, Detective Metcalf and Detective Ward met with Mann for an informal interview. Mann feigned a lack of knowledge about the choking incident. Later, when detectives attempted to clarify Mann's statement, Mann accused S.R. of throwing a phone at Mann during an "anger spat." Mann explained S.R. was talking to "some guy" on Facebook and accused S.R. of trying to bring this person into their relationship. Mann claimed to have "sat there calmly" and threatened to call the police if

S.R. threw the phone again. Mann denied hitting S.R. Mann also claimed to have the right to take away S.R.'s phone because Mann paid for the phone and the cellular service.

¶8 However, when the Detectives asked Mann about the worst thing Mann has ever done to S.R., Mann replied:

> Um, we were in a fight one night and she was just getting really, really irritating; agitated. I was getting agitated; she was getting irritating. And so, I flung full out across the, um, bed, pushed her down, and grabbed around her throat, and that was multiple years ago.

Some 10 minutes later, the Deputies arrested Mann, at which point Mann provided a different timeline of the story.

> DEPUTY: So the other thing I wanted to tell you is that you're under arrest, okay. For Partner or Family Member Assault and Strangulation.
>
> MANN: For what?
>
> DEPUTY: For the incident that happened two nights ago.
>
> MANN: It didn't happen two nights ago.
>
> DEPUTY: Okay, well –
>
> MANN: No.
>
> DEPUTY: -- that's --
>
> MANN: No. It didn't happen two nights ago, it happened multiple nights ago -- or multiple months ago.

¶9 Prior to the trial, the State provided proposed jury instructions which contained a notice the State intended to introduce M. R. Evid. 404(b) evidence. Mann responded with a Notice of Objection of 404(b) Evidence. The District Court held a hearing on this notice.

4

¶10    During the hearing, Mann argued the detectives' recording should be excluded because it consisted of admissions related to a prior assault on the victim, and not the charged conduct. The State argued the specific details in Mann's admission matched S.R.'s disclosures related to the charged assault, and Mann repeatedly changed the date of the admission, stating initially it happened "multiple years ago," then "multiple nights ago," and then "multiple months ago." Additionally, the State argued some of Mann's prior threats and acts of violence against S.R. were relevant under M. R. Evid. 404(b) for non-propensity purposes. The State was not using prior acts to show Mann had a propensity for violence. Instead, the State argued the prior acts showed a motive behind the assault and explained the relationship dynamic of power and control.

¶11    On the morning of the trial, the court issued its written order, excluding the portion of the recording where Mann discusses the "worst thing Mann has ever done to the alleged victim" and Mann's description of the strangulation. The court reserved its ruling on the admissibility of other acts evidence for trial.

¶12    S.R. testified first. When the State attempted to introduce evidence of Mann's monetary control over S.R., Mann objected to relevance. This being one in what was a series of meritless objections, the deputy county attorney, in a moment of frustration, responded (in the presence of the jury) her question was relevant as to the "controlling nature of [the] relationship." Because of this comment, Mann moved for a mistrial, and the District Court granted the motion. The court held there is a "high likelihood the jury [is] going to draw a character inference from the way the testimony was presented" and a curative instruction would not fix it. Because there was no proper briefing before the

5

pretrial hearing, the court explained it could not fully know the scope of S.R.'s testimony and "the State [is] trying to guess at what the Court's rulings are because [the court has not] been able to give [the parties] anything definitive."

¶13    Prior to the second trial, Mann filed a motion and brief to exclude evidence of other acts.[1]  Mann again challenged the admissibility of the recorded statement.  Mann also wanted to exclude the statements made to a case manager working with S.R. and Mann. The State again responded, arguing the prior acts of domestic violence were admissible to show motive, intent, and knowledge.  Specifically, the State wanted to introduce the "power and control" dynamic to explain why a domestic abuse victim might not report abuse or leave an abusive relationship.  The State proffered S.R. would testify Mann: (1) isolated S.R. from family and friends; (2) financially controlled S.R.; (3) forced S.R. to quit her job to serve Mann at home by making daily meals and cleaning; (4) forced S.R. to perform oral sex; (5) physically abused S.R.; (6) threatened to kill S.R., her family, and her pets, if S.R. disclosed the abuse to anyone; and (7) strangled S.R. when S.R. was noncompliant with one of Mann's demands.  The State argued each of these acts would show Mann's level of power and control over S.R.

¶14    The District Court issued a Superseding Order on Other Crimes, Wrongs, or Acts, holding the prior acts—other than allegations of coercive sexual activity—were admissible for limited purposes pursuant to Rules 403 and 404(b).  The court held the prior acts were not improper propensity arguments excluded under Rule 404(b).  The court found these

---

[1] The State also amended the Information to include a second count of Witness Tampering, after Mann allegedly posted threatening messages on Facebook targeted at S.R.

6

acts had substantial probative value as they were necessary to understand Mann's motive of "power and control" and S.R.'s behavior after the assault.

¶15 The court also allowed S.R. to testify in terms of what "usually" happened. The court based its holding on S.R. experiencing what is called "script memory." According to the "script theory," "humans organise experiences with similar instances (i.e. repeated event) as *general event representations* or *scripts*." Natali Dilevski et al., *Adult memory for specific instances of a repeated event: a preliminary review*, 28 Psychiatry, Psych., and L., Dec. 17, 2020, at 714, https://perma.cc/5VEE-PY5N (emphasis in original; hereinafter *Dilevski*).

> Scripts are conceptualised as hierarchically organised knowledge structures, composed of general and specific levels. At the general level, a script outlines *what usually happens* for that type of event, including information about the typical people, actions and objects for that event, as well as the temporal order in which the event usually takes place.
>
> Where an individual is remembering an instance of a repeated event, they might draw upon their script and recount what usually happens by providing information about the typical people, actions and objects for those events. In addition, an individual might then attempt to recall details that are specific to that event . . . .

*Dilevski*, at 714-715. In S.R.'s case, due to the repetitive nature of the abuse and a traumatic brain injury she suffered as a child, she would testify as to what "usually" happened and would sometimes fail to recall the specific details of the charged abuse. This contrasts with "episodic memory," where someone recalls "what," "where," and "when" an event occurs. Endel Tulving, *Episodic Memory: From Mind to Brain*, 53 Ann. Rev. of Psych., Feb. 2002, at 4, https://perma.cc/B265-B2U4. As the court explained, script memory "is not uncommon in domestic and sexual violence cases" where a victim was

7

subject to abuse over an extended period. The court explained excising "the 'usually's' from S.R.'s testimony" would make the testimony unintelligible to the jury. Because S.R.'s testimony is subject to cross-examination and impeachment, the court held the prejudicial effect of this testimony was minimal.

¶16 The court also limited the unfair prejudice of the State's proffered motive testimony by excluding "any allegations of coercive, forcible, or nonconsensual sexual activity" and limited the State's argument related to Mann's previous strangulations of S.R. The court explained:

> The Court will permit S.R. to testify that, among other types of abuse, Mann has strangled her in the past. S.R. may testify about *her* feelings, experiences, and perceptions—including feelings of fear or being controlled—based on past incidents of strangulation and how it contributed to her state of mind at the time of the alleged incident in question. The Court, however, will not permit S.R. to speculate about *why* Mann does so. Likewise, the State may not argue that Mann strangles for the purpose of obtaining compliance, as the argument is too indistinguishable from a propensity inference.

(Emphasis in original.) The court also cautioned the State to limit its use of the other acts evidence to prove the incident at hand and avoid impermissible character evidence.

¶17 Additionally, the District Court reversed its decision on Mann's statement to Detective Metcalf. The court limited the use of this statement to S.R.'s state of mind, or to prove these statements are confessions to this assault and not a past assault.

¶18 During the second trial, S.R. testified about the strangulation. S.R. also testified Mann had begun controlling the relationship almost immediately after it started. After S.R. and Mann moved in together, Mann told S.R. she did not need to work at her job anymore, and commanded S.R. to help Mann work as a DoorDash driver and to clean the house.

8

S.R. also testified Mann would abuse her by punching her on her face, body, or head. Mann also controlled S.R.'s finances by withholding S.R.'s Social Security Disability income and dictating how the money would be spent. S.R. testified Mann isolated her from her family. Mann would regularly take S.R.'s phone to check her messages. At times, Mann would delete S.R.'s contacts, knowing S.R. could not remember them. Mann repeatedly threatened to kill S.R. and her pets if S.R. angered Mann. Mann also stated, if Mann ever went to jail, "[Mann] would put ten cuts in [S.R.'s] body for every day [Mann] stayed in jail." S.R. testified she felt trapped in the abusive relationship, and she still fears coming across Mann when she goes for a walk.

¶19 S.R. did not testify about prior strangulations during direct examination. On cross-examination, Mann's counsel questioned S.R. about her inconsistent testimony: "Okay. So we have a couple statements from you. We have that [Mann] punched you and that [Mann] strangled you with [an] arm and that [Mann] strangled you with . . . hands, so which of those is the truth?"[2] During redirect examination, the State elicited testimony about other instances of abuse, where Mann either punched or strangled S.R. In closing, the State argued defense counsel was "gaslighting" S.R. into confusion by referencing

---

[2] Frazzled by the stress of testifying and her traumatic brain injury which affects her memory, S.R. would routinely testify she did not remember and would need her recollection refreshed. The State went so far as to "put a sticky note up [on the stand] . . . [to remind S.R.] not to talk about any forced sexual intercourse." This, combined with S.R.'s "script memory," led to a difficult cross-examination where defense counsel would have to read S.R.'s inconsistent statements to her, and S.R. would state she did not remember or was unsure about her earlier testimony. S.R. would also consistently apologize for not remembering and receive encouragement from the deputy county attorney, incurring objections to this encouragement from defense counsel. During closing, the State argued these inconsistencies were minimal, and Mann argued S.R.'s inconsistent testimony shows reasonable doubt.

other instances, and S.R.'s initial statement was not inconsistent with her testimony. The State did not elicit other prior strangulation testimony during the trial.

¶20 M.R. and Detective Metcalf also testified during the trial. The State introduced a recording of Metcalf's interview with Mann. Detective Metcalf testified about the similarities between Mann's admission and S.R.'s description of the strangulation. During closing arguments, the State argued Mann's statement was an admission to the charged offense.

¶21 The State also presented an expert witness, Gina Boesdorfer, who testified as a blind expert on domestic violence. Boesdorfer testified on the "power and control" dynamic typical of abusive relationships, explaining "an offender in that relationship is going to have a substantial amount of power and control and the victim is not going to have any power and control in the relationship." Boesdorfer explained "people often have a lot of misconceptions" about the people who stay or leave abusive relationships. When "people hear domestic violence, and physical violence is what a lot of people think about, but the dynamics around emotion and psychological abuse or someone who has control tactics look quite different."

¶22 Boesdorfer testified, in domestic violence relationships, there could be direct threats, intimidation, or violence in other areas of their life. While control might mean physical violence, it can also include things like taking away a victim's car keys or not allowing their partner to have access to employment or finances. Ultimately, control "impedes somebody's ability to make choices for themselves, to access certain supports [or] resources, to connect with friends, family, [or] other agencies . . . ." Boesdorfer

10

explained it can be harder for a victim to leave a relationship if they share housing, kids, pets, or finances with their abuser.

¶23 After the State concluded its case-in-chief, Mann moved for directed verdict on both counts. The court denied Mann's motion on the first count, concluding the State presented sufficient evidence to prove Strangulation of a Partner or Family Member. However, the court granted the motion on the second count of Tampering with a Witness. The court held the jury could not conclude Mann's statements were a threat directed at S.R., as opposed to "someone just venting [on Facebook] about" being prosecuted by the State.

¶24 The jury found Mann guilty of Strangulation of a Partner or Family Member. The District Court sentenced Mann to five years in Montana State Prison, all suspended. Mann now appeals this conviction.

### STANDARD OF REVIEW

¶25 "This Court reviews a district court's ruling regarding the admission of other crimes, wrongs, or acts for an abuse of discretion." *State v. Palmer*, 2024 MT 25, ¶ 10, 415 Mont. 150, 543 P.3d 566 (internal citation omitted). "A district court abuses its discretion if it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *Palmer*, ¶ 10 (internal citation omitted). Even if a court abuses its discretion in an evidentiary ruling, the abuse constitutes reversible error only if "a substantial right of the party is affected." *Palmer*, ¶ 10 (internal citation omitted). "To the extent the court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo." *Palmer*, ¶ 10 (internal citation omitted).

11

**DISCUSSION**

¶26    *Whether the District Court abused its discretion by permitting other acts testimony.*

¶27    Mann argues the District Court incorrectly applied M. R. Evid. 403 and 404(b) when it admitted testimony about Mann's prior acts of domestic abuse and control.  Mann argues these acts were not admissible under the "motive" exception under Rule 404(b). And even if they were admissible under Rule 404(b), Mann argues the evidence was prejudicial and should have been excluded under Rule 403.

**M. R. Evid. 404(b)**

¶28    Under Rule 404, "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."  M. R. Evid. 404(a).  Rule 404(a) prohibits propensity arguments, where the State argues a defendant was predisposed to commit the charged offense because the defendant committed other bad acts in the past.  "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  M. R. Evid. 404(b).  However, Rule 404 carves out an exception, providing a non-exhaustive list of permissible purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  M. R. Evid. 404(b).  Under Rule 404(b), other acts evidence is admissible when the proponent can clearly articulate a chain of logical inferences where no link relies on a prohibited inference.  *State v. Madplume*, 2017 MT 40, ¶ 23, 386 Mont. 368, 390 P.3d 142; *see, e.g., United States v. DeCicco*, 370 F.3d 206, 214 (1st Cir. 2004) (where a defendant allegedly

12

committed arson to use insurance proceeds to cover a tax debt, evidence of prior tax evasion was admissible to show the motive for the arson, and not for a propensity to commit fraud).

¶29 On appeal, Mann first argues motive was not at issue in the case. Specifically, Mann references the detectives' recording, where Mann admits to a different motive: jealousy. Mann asserts that, had the State proceeded with this motive, the State would not need to introduce the complex evidence of the "power and control" dynamic and the prior bad acts displaying this dynamic.

¶30 Connecting the facts to the relationship dynamic underlying the motive can be essential in domestic abuse prosecutions. "We have previously recognized the evidentiary challenges involved in proving a charge arising from domestic violence, including the need to provide clarification for the jury about potentially 'perplexing behavior' of such victims." *State v. Palmer*, 2024 MT 25, ¶ 14, 415 Mont. 150, 543 P.3d 566 (citing *State v. Haithcox*, 2019 MT 201, ¶ 19, 397 Mont. 103, 447 P.3d 452). The investigation revealed not a singular case of jealousy, but a pattern of controlling and abusive behavior perpetrated by Mann. It was within the State's discretion to explain the underlying dynamic of the relationship to the jury. The State is not required to limit itself to a theory of the case which would be the least prejudicial and easiest to defend by Mann.

¶31 Moreover, contrary to Mann's allegations, the State did not "contrive a more complicated motive" in an attempt to "smuggle in propensity evidence." The State's motive was essential in explaining most of S.R.'s decisions after the assault, such as not calling the police immediately after the assault, not leaving the house, and not separating herself from her abuser. *See Palmer*, ¶ 14. S.R.'s apprehension toward filing the report

13

could lead the jury to question the veracity of her testimony. Additionally, the State's evidence explained S.R.'s on-the-stand demeanor, including why S.R. experienced "script memory," why she was nervous during the trial, and why she needed to refresh her recollection about statements she made earlier that same day and in the previous trial. Mann's defense consisted of highlighting S.R.'s inconsistent statements to show S.R. was either lying or uncertain about the assault. The defense also portrayed S.R.'s sister, M.R., as a possible originator of the strangulation accusation. The relationship dynamic was essential to counter Mann's "inconsistent statements" defense and explain why M.R. played a significant role in the development of the investigation by helping her sister escape Mann's control.

¶32 The State's ability to introduce prior acts based on the motive is not without limitation. "Motive can be a broad, nebulous concept." *State v. Blaz*, 2017 MT 164, ¶ 14, 388 Mont. 105, 398 P.3d 247. Appropriately, "we have cautioned about the use of generalized motive as a basis for admission of prior act evidence." *Palmer*, ¶ 16 (internal citation omitted).

> [T]he motive is *cause, and the charged and uncharged acts are effects*; that is, both acts are explainable as a result of the same motive. The prosecutor uses the uncharged act to show the existence of the motive, and *the motive in turn strengthens the inference of the defendant's identity* as the perpetrator of the charged act.

*Blaz*, ¶ 14 (quoting *State v. Dist. Ct. of Eighteenth Jud. Dist. of Montana*, 2010 MT 263, ¶ 59, 358 Mont. 325, 246 P.3d 415 (emphasis in original). In *Blaz*, the defendant was charged with deliberate homicide after his infant daughter died in his care. *Blaz*, ¶¶ 1-3. The State introduced the defendant's prior conviction for Partner or Family Member

14

Assault (PFMA), which occurred a month before the homicide. *Blaz*, ¶ 4. The State, in part, argued the assault shows motive. The State identified the motive of the defendant's hostility towards his wife and her children. *Blaz*, ¶ 13. We rejected this motive of "general hostility or disregard for others" as too broad. *Blaz*, ¶ 15.

¶33 In *Palmer*, the defendant was charged with PFMA after assaulting his girlfriend. *Palmer*, ¶ 2. The defendant filed a motion in limine to prohibit the introduction of other acts. *Palmer*, ¶ 5. The State argued prior incidents were "admissible to show lack of mistake" and to "provide the jury with context and understanding of why [the victim] was so fearful of [the defendant] and why she was reluctant to tell [an officer] what happened." *Palmer*, ¶ 5. The district court allowed the other acts testimony, and we affirmed. *Palmer*, ¶ 5. Contrasting the case with *Blaz*, we recognized motive "can rise to a specific hostility toward a certain individual that may provide a suitable basis for admission." *Palmer*, ¶ 16.

¶34 This case is analogous to *Palmer*. Here, the motive is the same "power and control" motive we affirmed in *Palmer*. *Palmer*, ¶ 16. This motive speaks directly to S.R.'s behavior and Mann's control over her. It is not an amorphous general intent to harm others as seen in *Blaz*. That motive would be indistinguishable from a propensity argument. The State's evidence of Mann's motive explained the cause of Mann's assault of S.R. (to reestablish control over S.R. after her actions undermined Mann's control). This "power dynamic" testimony also explained S.R.'s seemingly odd behavior after the assault and during the trial. And this motive directly countered Mann's defense at trial. The evidence was admissible under Rule 404(b).

15

¶35　The Dissent argues this holding holds open the door for all prior bad acts involving a similar offense to be admitted under a "motive" label, but in fact being used as "propensity" evidence. Dissent, ¶ 54. The Dissent reiterates the dissenting analysis in *State v. Crider*, 2014 MT 139, ¶¶ 59-63, 375 Mont. 187, 328 P.3d 612 (McKinnon, J., dissenting), that the Court has blurred the distinction between the two. Dissent, ¶¶ 53-55. But after hearing the same arguments, the Court rejected that theory in *Crider*:

> [T]he State sought to admit Crider's prior incidents with M.W. as probative of Crider's motive to control or harass M.W. Such a motive was relevant, not only to Crider's motive as to the sex acts alleged, but also to his motive to commit the offenses of PFMA and witness tampering with which he was also charged related to this incident.

*Crider*, ¶ 28. This case is squarely within our prior holdings in *Crider* and *Palmer*. The State asserted Mann had a motive to exercise power and control over S.R., and the prior acts of abuse were evidence of the motive, just as the charged acts were. *Crider*, ¶ 28. And the evidence of prior abuse was properly admitted to explain S.R.'s behavior, including her reluctance to escape the relationship and contact the police, and "in turn, maintain her credibility." *Palmer*, ¶ 14 (quoting *Haithcox*, ¶ 19).

**M. R. Evid. 403**

¶36　Other acts evidence must also be admissible under Rule 403. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403. Because all evidence relevant to prove a case is somewhat prejudicial to the defendant, the evidence cannot be simply damaging to the defendant's case. *State v.*

16

*Lake*, 2022 MT 28, ¶ 32, 407 Mont. 350, 503 P.3d 274.  Instead, the evidence must be "likely to arouse or provoke jury disdain and hostility for the other party without regard to its probative value in the context of the other evidence in the case."  *Lake*, ¶ 32; *accord Old Chief v. United States*, 519 U.S. 172, 180, 117 S. Ct. 644, 650 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

¶37    When weighing Rule 403, the court should consider the diminishing marginal probative value of cumulative evidence and "any actually available substitutes" to the evidence with "substantially the same or greater probative value but a lower danger of unfair prejudice."  *Lake*, ¶ 41 (quoting *Old Chief*, 519 U.S. at 182–83, 117 S. Ct. at 651); *see, e.g., United States v. Bowman*, 302 F.3d. 1228, 1239–40 (11th Cir. 2002) (finding abuse of discretion when the district court admitted evidence of a "whites-only" policy of a criminal motorcycle gang to show unity of purpose, where the evidence was cumulative and created the possibility "the jury's verdict might be clouded by racial issues").

¶38    Here, as explained above, the evidence was relevant for a non-propensity purpose, to explain S.R.'s behavior and the relationship between the two.  However, some of the proposed testimony was more prejudicial than others.  On one side of this scale, there was evidence of prior sexual assault.  This testimony could create a significant amount of prejudice.  Even with a jury instruction, it would be difficult for a jury not to convict Mann based on prior sexual assault.  This evidence would lure the factfinder into declaring guilt

based on the sexual assault, and not on the charged strangulation. *See Lake*, ¶ 32; *Old Chief*, 519 U.S. at 180, 117 S. Ct. at 650.

¶39 This contrasts with less prejudicial evidence. S.R. testified about Mann telling her to quit her job and work with Mann as a DoorDash driver; controlling her finances; restricting contact with the family; and using violence and threats to control S.R.'s behavior. This evidence is highly probative of the relationship between S.R. and Mann, and it does not create a significant risk of the jury making a prohibited propensity inference.

¶40 The District Court drew the line between these two points, excluding testimony on Mann's prior sexual assault but allowing the remainder of the evidence. On prior strangulation evidence, the court held:

> The Court will permit S.R. to testify that, among other types of abuse, Mann has strangled her in the past. S.R. may testify about *her* feelings, experiences, and perceptions—including feelings of fear or being controlled—based on past incidents of strangulation and how it contributed to her state of mind at the time of the alleged incident in question. The Court, however, will not permit S.R. to speculate about *why* Mann does so. Likewise, the State may not argue that Mann strangles for the purpose of obtaining compliance, as the argument is too indistinguishable from a propensity inference.

(Emphasis in original.) The court did not abuse its discretion when drawing this line.

¶41 During S.R.'s direct examination, the State did not elicit testimony about any prior acts of strangulation. Instead, the State relied on Mann's other abusive behavior towards S.R. to explain the "control and power" dynamic. During cross-examination, Mann attempted to impeach S.R. over her inconsistent testimony compared to the previous trial, asking:

> DEFENSE COUNSEL: Which of those methods of strangulation on November 16th is true?

18

S.R.: [Mann] used [Mann's] arm because [Mann] put me in a choker hold.

DEFENSE COUNSEL: So when you previously testified that [Mann] put [Mann's] hands around your neck, that was not true?

S.R.: I don't even remember saying that.

DEFENSE COUNSEL: So I just showed you the transcript.

S.R.: Yes, I know you did, but I don't - - I can read it because there's right there on words - - [ ] but I can't remember.

.   .   .

DEFENSE COUNSEL: Okay.  So we have a couple statements from you. We have that [Mann] punched you and that [Mann] strangled you with [an] arm and that [Mann] strangled you with . . . hands, so which of those is the truth?

S.R.: [Mann] just hurt me.

On redirect examination, the State clarified S.R.'s statements by eliciting testimony about prior strangulations and abuse which involved punching and use of hands.

PROSECUTOR: Almost done. [S.R.], when you met with the detective back a year ago, did you talk about more than just this strangulation?

S.R.: Yes.

.   .   .

PROSECUTOR: Did you talk about every time you got beaten or just a few?

S.R.: It was what I could remember.

PROSECUTOR: What you could remember.  In the course of talking about getting beaten, did you talk about getting punched?

S.R.: Yes.

PROSECUTOR: Did you talk about getting strangled?

19

S.R.: Yes.

PROSECUTOR: In the transcript [defense counsel] showed you, did you talk about getting beaten and strangled, do you remember that?

S.R.: No.

The prosecutor then used the transcripts of S.R.'s prior testimony and her law enforcement interview to try to refresh her memory and bring in S.R.'s prior statement that she had first stated Mann used a "choker hold" to strangle her. The additional instances of strangulation were offered to explain S.R.'s confusion between stating Mann had strangled her with an arm choke hold, as well as using Mann's hands. Through this, the jury heard Mann had abused S.R. on prior occasions and had strangled her at least once previously. The State did not use this testimony to make a prohibited propensity inference.

¶42     The State used the testimony of prior strangulation for a permissible purpose, limited its use to avoid a prejudicial inference by the jury, and did not present needlessly cumulative evidence. This being the only reference to prior strangulations during the trial, the court did not abuse its discretion in allowing this testimony.

**Mann's Incriminating Statement to the Detectives**

¶43     Additionally, the court admitted Mann's recorded admission to a strangulation, "provided that the State confines its use of these excerpts to the limits established in this Order or to argue that these are *actually* tentative admissions to the incident charged." (emphasis in original). In the recording, Mann states:

> Um, we were in a fight one night and she was just getting really, really irritating; agitated. I was getting agitated; she was getting irritating. And so I flung full out across the, um, bed, pushed her down, and grabbed around her throat, and that was multiple years ago.

20

Then later, Mann stated a different date of this event.

> DEPUTY: So the other thing I wanted to tell you is that you're under arrest, okay. For Partner or Family Member Assault and Strangulation.
>
> MANN: For what?
>
> DEPUTY: For the incident that happened two nights ago.
>
> .  .  .
>
> MANN: No. It didn't happen two nights ago, it happened multiple nights ago -- or multiple months ago.

The State argued, because of the similarities in Mann's description and the charged strangulation, Mann's statement was an admission to the charged event. The State reinforced its argument with Mann's inconsistent date of the event. Mann argues this statement was an admission to a prior strangulation, the court correctly excluded the statement in the first trial, and the court incorrectly reversed itself for the second trial.

¶44    The jury was instructed on the issue of Mann's admission.

> A statement made by a Defendant other than at this trial may be an admission or a confession.
>
> A confession, as applied in criminal law, is a statement by a person made after the offense was committed that he/she committed or participated in the commission of a crime. An admission is a statement made by the accused, direct or implied, of facts pertinent to the issue, and tending, in connection with proof of other facts, to prove his/her guilt. A conviction cannot be based on an admission or confession alone.
>
> The circumstances under which the statement was made may be considered in determining its credibility or weight. You are the exclusive judges as to whether an admission or a confession was made by the Defendant, and if so, whether such statement is true in whole or in part. If you should find that any such statement is entirely untrue, you must reject it. If you find it is true in part, you may consider that part which you find to be true.

21

This Court has also explained "An 'admission' is defined as 'an avowal or acknowledgement of a fact or of circumstances from which, together with other facts, guilt may be inferred.'" *State v. Goltz*, 197 Mont. 361, 369, 642 P.2d 1079, 1084 (1982) (quoting 22 C.J.S. Criminal Law § 730(a)). The admission need not fully confess to the charge; partial admissions are also admissible. It is the jury's role to evaluate the defendant's statement to determine it is an admission or confession in light of the surrounding circumstances and the evidence presented.

¶45 Rule 404 was inapplicable to Mann's incriminating statement because the statement did not involve *other* crimes. Throughout the trial, the State did not use this statement to make a propensity argument. The State only argued this statement described the charged offense. Nor would this statement be prejudicial under Rule 403. This evidence did not "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180, 117 S. Ct. at 650; *accord Lake*, ¶ 32. The District Court did not abuse its discretion by superseding its prior order and allowing the introduction of this statement.

## CONCLUSION

¶46 The District Court is affirmed.

/S/ CORY J. SWANSON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE

22

Justice Laurie McKinnon, dissenting.

¶47 This trial should have been about what happened on November 16, 2021. Montana precedent may permit limited same-victim relationship evidence in some domestic-violence prosecutions. It does not permit the State to prove this charged strangulation with prior strangulations and beatings relabeled as "motive" or "context." The Court gives a broad sweep to what constitutes non-propensity evidence and makes "motive" and "propensity" and "context" interchangeable. In doing so, it runs the risk that prosecutors will seek to introduce prejudicial propensity evidence in every case involving evidence of a past offense which is identical to the charged offense without boundaries set for the district courts to act as gatekeepers.

¶48 In Mann's first trial, the District Court declared a mistrial after the State introduced statements from Mann intended to demonstrate Mann's controlling nature and after the prosecutor herself referred to Mann's "controlling nature" in front of the jury. In chambers, following Mann's motion for mistrial, the court articulated that "[t]he words *controlling nature*, by their very nature [. . .] is a statement of character" and that this violated an earlier order of the court cautioning the State against the use of character evidence unless Mann opened the door. (Emphasis added.) The District Court's prior order addressed Mann's interview with law enforcement and her purported admission that she had at some point in time before the alleged offense on November 16, 2021, choked S.R. In its pre-trial order, after noting that the State was offering the evidence for the nonpropensity purpose of an admission and was not attempting to use the evidence to demonstrate Mann's violent,

23

controlling, or abusive character, the court considered whether the evidence was unfairly prejudicial under Rule 403. In its order, the court held the proffered evidence was not:

> evidence of a "criminal signature" or to provide meaningful support for the State's assertion that this evidence is so similar to the alleged events at issue here that they should be deemed an admission to them. The most probable inference the jury will draw from this portion of the statement is that Mann choked the alleged victim in the past, leaving substantial risk that the jury might infer that if Mann choked her in the past, she more likely choked her now. The Court does find the probative value of this portion of the recording substantially outweighed by the risk of unfair prejudice.

Emphasizing that the State was not contending there were any prior incidents and that Mann's statements were about the November 16 incident, the court allowed the remainder of the recording to be admitted. Thus, the District Court held the prior choking statements must be excluded under Rule 403 because they were unfair prejudicial propensity evidence. In my opinion, the court was correct.

¶49 Prior to Mann's second trial, the parties sought clarification from the District Court on admissibility of evidence pursuant to Rules 404(b) and 403. In a complete turn-around from its earlier view of the same evidence, the District Court noted that this Court had moved to a more expansive interpretation of motive and, referring to *Haithcox*, allowed "the motive net to be cast" broadly. Concluding that evidence Mann sought to control S.R. was admissible, the District Court made the following findings:

> There are two chains of inferences connecting the prior acts to the alleged offense. In one chain of inferences, the prior relationship issues evince a motive to exert power and control over S.R., and the State contends that this motive makes it more probable that Mann assaulted S.R. by explaining *why* Mann assaulted S.R. in the context of their specific altercation. This does not depend on a character inference. In the second chain of inferences, the prior relationship issues provide important context to understand why S.R. and Mann acted the way they did on the incident in question, assisting the

24

jury in understanding S.R.'s testimony and providing a better foundation for evaluating her credibility. This, too, does not depend on a character inference. Accordingly, because the State can show this evidence to be relevant for a non-propensity purpose, Rule 404(b) does not bar its admission.

(Emphasis in original.) The court then considered Rule 403. It found that "so long as the State is careful to frame and use the evidence of the relationship for the limited purposes the [c]ourt permits—to contextualize and explain the relationship, to make more plausible S.R.'s account of what happened, and to explain her behavior—the [c]ourt does not find there to be an undue risk of the jury drawing an impermissible character inference." Significantly, the court found that evidence Mann commonly strangles S.R. when S.R. does not comply with her demands was impermissible, and that "the risk of the jury using testimony or argument that Mann tends to strangle S.R. to obtain her compliance in a way forbidden by Rule 404(b) propensity evidence" was too high.

¶50   However, the District Court, rather than excluding strangulation evidence, decided to admit it, contrary to its finding that the risk of prejudice was too high. It held:

> The [c]ourt will permit S.R. to testify that, among other types of abuse, Mann has strangled her in the past. S.R. may testify about *her* feelings, experiences, and perceptions—including feelings of fear and being controlled—based on past incidents of strangulation and how it contributed to her state of mind at the time of the alleged incident in question. The [c]ourt, however, will not permit S.R. to speculate about *why* Mann does so. Likewise, the State may not argue that Mann strangles for the purpose of obtaining compliance, as the argument is too indistinguishable from a propensity inference.

(Emphasis in original.)

¶51   S.R. testified at Mann's second trial that she was talking to someone on Facebook, which caused Mann to get mad and take her phone. S.R. testified Mann was controlling.

25

S.R. said Mann would hit her if she did not clean the house, and that she would punch her in the face, head, and body. S.R. testified that Mann controlled their money and that Mann threatened to harm her pets if she did not do as Mann said. Family members were not allowed to visit S.R. Further, S.R. testified to prior beatings and strangulations by Mann during redirect examination. This is true despite Mann's counsel being careful to limit her cross-examination to only the November 16 incident. Thus, the Court's statement that the State's "exploration" of prior strangulations served to counter Mann's inconsistent statements defense, Opinion, ¶ 31, is not true. Nonetheless, testimony about prior strangulations and beatings during redirect was allowed pursuant to the District Court's prior order. Based on this record, I address the law.

¶52 The first inquiry in a Rule 404(b) analysis is to examine the purpose for which the evidence is being admitted. Rule 404(b)'s general prohibition applies to any conduct, criminal or noncriminal, that effectively "impugns or reflects negatively on the defendant's character." *Lake*, ¶ 26. Importantly here, "[m]ere reference to a permissible purpose is insufficient for admission of other acts evidence under Rule 404(b)." *Madplume*, ¶ 23. "[B]efore other crimes evidence can be admitted under [Rule 404(b),] the purpose justifying the admission of the evidence must be at issue in the current charge." *State v. Aakre*, 2002 MT 101, ¶ 11, 309 Mont. 403, 46 P.3d 648. Here, the State played a recorded statement that Mann told law enforcement S.R. was messaging someone on Facebook and calling him "honey." As Mann argues in his briefing on appeal, the motive for the charged assault was obvious: jealousy. The State cannot merely recite one of the 404(b) factors to usher in propensity evidence as it did here. The jury could easily find that Mann had a

motive, apart from control and prior bad acts, to assault S.R. when S.R. contacted a person on Facebook, called him "honey," and, in doing so, made Mann jealous. Even if motive remained relevant in a general sense, the State did not need prior beatings and strangulations to prove it. The immediate motive for the charged altercation was obvious from the parties' own evidence: Mann became angry when S.R. was messaging someone else on Facebook. What the State sought to add was a different and far more prejudicial theory—that Mann had previously used violence, including strangulation, to dominate S.R. That theory depends on the forbidden inference that because Mann had strangled S.R. before, she likely strangled her again.

¶53     It is necessary to recount basic distinctions between motive and character evidence which I have done previously in *Crider*. Motive is rarely an element of a crime. It is, however, an intermediate, evidentiary fact that can be used to establish an ultimate fact in the case. David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 8.1, 488 (Aspen 2009); Edward J. Imwinkelried, *Uncharged Misconduct Evidence* vol. 1, § 3:15, 3-95 (rev. ed., Thomson Reuters/West 2009). There are two ways in which uncharged misconduct can be used under a motive theory. In the first, the uncharged act supplies the motive for the charged act. In a homicide prosecution, for example, evidence that the defendant was involved in a prior theft may be relevant under a motive theory where, prior to her death, the homicide victim learned of the defendant's involvement in the theft and threatened to report it to authorities. The theft and the victim's knowledge of it furnish a motive for the defendant to prevent the victim from revealing the theft, which supports the inference that the person responsible for the victim's death is the

27

defendant. Leonard, *Evidence of Other Misconduct and Similar Events* § 8.2, 491-92. Many other persons presumably had no motive to murder the victim; thus, the fact that the defendant did have a motive for killing the victim raises the probability that the defendant is the one who did so. Imwinkelried, *Uncharged Misconduct Evidence* § 3:15, 3-97.

¶54 Under the second method, the uncharged act does not provide the motive for the charged act, but instead evidences the existence of a motive, such as a desire for revenge, which explains both the uncharged act and the charged act; in other words, "the charged crime can be understood as another expression of the feelings revealed in the [uncharged] acts." Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* vol. 1, § 4:32, 802 (3d ed., Thomson/West 2007); Imwinkelried, *Uncharged Misconduct Evidence* § 3:15, 3-98 to 3-99. We applied this theory in *Eighteenth Judicial District Court*, where the defendant was charged with causing the death of her infant daughter. *Eighteenth Jud. Dist. Ct.*, ¶ 6. We held that evidence of the defendant's past hostility toward and abusive treatment of the infant was admissible to show that the defendant was frustrated and angry and did not want her daughter and, therefore, that the defendant had a motive to cause the infant's death. *Eighteenth Jud. Dist. Ct.*, ¶ 58-59. The Court and the State purport to rely on this latter approach.

¶55 Applying these principles here, I find Mann's argument on appeal compelling. Mann argues that the State's chain of logical inferences was as follows: (1) Mann has strangled S.R. in the past; (2) the strangulation is evidence of a "motive" to control S.R.; and (3) this "motive" makes it more likely Mann committed the charged offense of strangulation. In step (2), however, motive depends on a propensity inference and is thus

really propensity evidence, i.e. because Mann has strangled in the past there is a good chance or high propensity that she strangled S.R. for the charged offense. The inference depends on Mann's bad character of having strangled S.R. in the past, and nothing else. The Court's interchangeable use of "motive" and "propensity" evidence circumvents Rule 404(b)'s prohibition against prior bad acts and effectively means that in every case involving evidence of a same or similar offense to the one charged, a defendant's prior bad acts will establish a motive. Further, "[t]he more difficult it is to distinguish motive and character, the greater the danger of jury misuse." Leonard, *Evidence of Other Misconduct and Similar Events* § 8.3, 504. "Character is thought to be a generalized tendency to act in a particular way, caused by something internal to the actor that arises from that person's moral being." Leonard, *Evidence of Other Misconduct and Similar Events* § 8.3, 493-94. In contrast, "motive is more specific than character, and its existence in a given situation does not depend on the person's morality." Leonard, *Evidence of Other Misconduct and Similar Events* § 8.3, 496. I do not read *Crider*, *Haithcox*, or *Palmer* to mean that all same-victim relationship evidence becomes admissible whenever the state invokes "power and control." Those cases recognize that some general evidence of relationship dynamics may be admissible in an appropriate case. This case is different because the challenged evidence included the same kind of act as the charged offense—prior strangulations. As to that evidence, its principal logical force is not a specific nonpropensity motive, but the forbidden inference of action in conformity therewith. *See Lake*, ¶ 27; *Madplume*, ¶ 23; *Rowe*, ¶ 25.

¶56 The rules of evidence apply with equal force in domestic-violence prosecutions. There is no domestic violence exception to Rules 404(b) and 403. Whatever room *Crider*, *Haithcox*, and *Palmer* leave for limited relationship-dynamics evidence, they do not authorize admission of same-kind prior strangulations when the probative chain depends on propensity and when the trial court itself found the risk of improper use "too high."

¶57 Lastly, the Court does not address the District Court's decision that "context" also is a basis for admitting the prior bad acts evidence. However, "context" does not rescue the ruling. The facts, here, were not the same as in *Palmer* or *Haithcox*, where prior-act evidence helped explain markedly perplexing victim behavior. S.R. tried to call her sister that night, spoke with her the next day, and met with law enforcement the following day. The State also called a blind expert who explained the power-and-control dynamics of domestic violence and why victims may remain in abusive relationships. Given those lower-prejudice substitutes for context, see *Lake*, ¶ 41; Old Chief v. United States, 519 U.S. 172, 182-83, 117 S. Ct. 644, 651 (1977), the marginal value of prior beatings and strangulations was slight, while the risk of propensity use remained overwhelming.

¶58 In my opinion, the record in this case is dispositive. It reflects incompatible conclusions and findings by the trial court. The District Court specifically held: "Thus, this [c]ourt finds that the risk of the jury using testimony or argument that Mann tends to strangle S.R. to obtain her compliance in a way forbidden by Rule 404(b) to be too high." In its very next sentence, the court "permit[ed] S.R. to testify that, among other types of abuse, Mann has strangled her in the past." It's finding that the strangulation evidence was unfairly prejudicial under Rule 403 was a factual finding that was not clearly erroneous.

The District Court appreciated the highly prejudicial nature of the prior strangulation evidence and excluded it from the first trial. In the second trial, the District Court made the same conclusion regarding the risk of admitting prior strangulation evidence but reached a different conclusion as to admissibility. I would conclude that the Rule 403 finding should control, at a minimum, the outcome of these proceedings and that the prejudicial nature of the evidence regarding prior beatings and strangulation outweighed its probative value.

¶59 Contrary to the Court's interpretation of the record, defense counsel did not "open the door" to proof of prior beatings and strangulations merely by impeaching S.R. with inconsistencies about whether the charged incident involved an arm, hands, or a punch. That cross-examination may have justified limited clarification of the charged event. It did not justify asking on redirect whether S.R. had talked about "every time" she got beaten and strangled. That inquiry shifted the jury's focus from what happened on November 16, 2021, to whether Mann had done similar things in the past.

¶60 The same analysis applies to Mann's recorded statement. In the first pretrial order, the District Court correctly concluded there was not "meaningful support" for treating Mann's description of a choking incident which "happened years ago" as an admission to the charged offense and that the most probable inference was that Mann had choked S.R. in the past. The superseding order never persuasively explained its reversal. The State could not evade Rules 404(b) and 403 by relabeling an ambiguous description of a past choking as a "tentative admission[]" to what occurred on November 16, 2021. Because the ruling collapses the distinction between motive and propensity and permits same-kind

prior strangulations to prove a charged strangulation, it erodes the limiting force of Rules 404(b) and 403, and leaves trial courts without a workable boundary.

¶61 The error was not harmless. This was a credibility case. The State used the power-and-control narrative throughout the trial, played Mann's ambiguous choking statement, and in closing told the jury not to worry whether it happened "November 17, 16, 15, 14." Under these circumstances, there is at least a reasonable possibility that the prior beatings and prior strangulation evidence contributed to the verdict. *See State v. Van Kirk*, 2001 MT 184, ¶ 47, 306 Mont. 215, 32 P.3d 735; see also State v. Reichmand, 2010 MT 228, ¶ 23, 358 Mont. 68, 243 P.3d 423.

¶62 This case is a straightforward application of character evidence used to improvidently admit damaging propensity evidence. Under the circumstances, the jury did not need to hear about prior beatings and strangulations because there were no unusual circumstances needing clarification or explanation for the jury. S.R. reported to her sister and law enforcement shortly after the offense; S.R. testified competently about the facts to the jury; Mann's own statement to law enforcement established why she was angry; and two expert witnesses explained to the jury the power dynamics of domestic violence. Disturbingly, once again, the Court too broadly casts a net for motive evidence, rendering it indistinguishable from propensity evidence and, in doing so, ushers into trial courts confusion and unnecessary litigation whenever the prior bad acts are the same as the charged offense.

¶63 I dissent.

/S/ LAURIE McKINNON

Justices Ingrid Gustafson and Katherine Bidegaray join in the dissenting Opinion of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON
/S/ KATHERINE M. BIDEGARAY